**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Danny Lee FULTZ, Defendant-Appellant.**

**No. 79–5360.**

United States Court of Appeals,
Sixth Circuit.

Argued April 10, 1980.

Decided May 5, 1980.

W. Gary Blackburn, Barrett, Lenahan, Kniffen & Ray, Nashville, Tenn., for defendant-appellant.

John H. Cary, U. S. Atty., Robert E. Simpson, Knoxville, Tenn., for plaintiff-appellee.

Before LIVELY, MERRITT and KENNEDY, Circuit Judges.

PER CURIAM.

Defendant appeals from his conviction for possession of a sawed-off shotgun in violation of 26 U.S.C. §§ 5861(d) and 5871. The only issues before the court arise from the district court's denial of a motion to suppress the shotgun as evidence and to return defendant's truck from which the weapon was seized.

The officers who searched the truck of the defendant had no warrant. They had been called to the scene of a disturbance in rural Claiborne County, Tennessee between midnight and 1:00 a. m. A security guard at a plant where a strike was going on reported that weapons were being fired toward the plant from an area where five or six vehicles were parked some distance from the plant. When officers from the sheriff's department arrived at the scene, the plant guard told them he had seen muzzle flashes coming from the area, "right in the middle of the strikers." Though the guard stated at the hearing, on cross-examination, that at least one of the weapons "sounded like a carbine," he reiterated his previous testimony that he saw "muzzle flashes" and "I knew *they* were shooting from that end."

When they arrived in the area from which the guard said the shots had come, the officers were told by one of the group congregated there that there had been no gunfire. The officers searched all the vehicles in the area. Early in the search, a carbine rifle was found under a school bus parked with the strikers' cars and trucks. The defendant argues that even if there was probable cause to begin a search, it should have been stopped when the carbine was found since no other weapon had been identified. As we have shown, the witness to the shooting told the officers "they" had been firing shots and that he had seen several muzzle flashes. It was reasonable for the officers to continue to search for other weapons after the carbine was found. Discovery of the carbine gave additional reason to seek other weapons since the officers then had reason to believe that the earlier disclaimer was false.

We thus agree with the district court that the officers had probable cause to search the vehicles. (The defendant was not searched or frisked.) We also agree that under the circumstances the search could be lawfully conducted without a warrant. The nearest judicial officer from whom a warrant could be obtained lived approximately 13 miles from the scene of the search. About five police officers were at the scene. If one had been dispatched to get a warrant, it would have been reasonable for the remaining officers to seize and hold the truck of defendant and the other vehicles until the warrant was obtained. The Supreme Court has held that when there is probable cause for search of a vehicle there is no difference for constitutional purposes between seizing and holding a vehicle until a warrant is obtained and, on the other hand, carrying out an immediate search without a warrant. "Either course is reasonable under the Fourth Amendment." *Chambers v. Maroney*, 399 U.S. 42, 52, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970).

At oral argument counsel for the defendant stated that the deputy who conducted the search was also involved financially in the company which furnished security guards to the struck plant. He emphasized that the deputy was acting in his official capacity and that the search of defendant's truck was not a private search. Nevertheless, he urged this court to infer that the deputy acted differently in this case than he would have in the absence of a connection with the struck plant and to hold that he conducted a "general search" that was unreasonable. The district court heard the evidence which related the tie between the deputy and the struck plant. There was probable cause to conduct a search and the district court found no unreasonable extension of the search. This determination was not erroneous.

We find no merit in the remaining contentions of the appellant.

The judgment of the district court is affirmed.

MERRITT, Circuit Judge, dissenting.

Here the government concedes that the deputy sheriff of Claiborne County, Tennessee, who conducted the search in question was in the pay of a company trying to break a strike. We should therefore scrutinize even more carefully than usual any warrantless, nighttime search of the strikers' personal effects conducted by the deputy upon information furnished by the company security guard—a man who was on loan from the deputy's private security guard service.

My reading of the record convinces me that the deputy was told by the company guard only that the strikers had fired several volleys from a carbine rifle. There is no evidence that the strikers fired more than one weapon. The security guard for the company testified as follows:

Q. Now, while you were sitting in your pickup truck, did you observe the strikers there, or where the cars were parked down in this area?

A. Yes, sir. I could see them. And like I said, they had been shooting firecrackers.
As I was sitting in my truck I heard a couple of real loud—it didn't exactly sound like firecrackers. I turned to look, and I seen muzzle flashes.

Q. Where were the muzzle flashes coming from?

A. Right out of the middle of where they were.

Q. When you say "they," the strikers? The court: What do you mean by "muzzle flashes?"

A. The fire that comes out of the end of a gun when you shoot it.

.    .    .    .    .

(App. 10–11)

Q. Have you formed a conclusion in your mind, based upon your knowledge of weapons as to what type of weapon it was that you saw discharge?

A. I really hadn't given much thought about that. I just knew it was a gun.

Q. Haven't you testified before that you believe this was a carbine?

A. It sounded like a carbine.

Q. And you owned an M–1 carbine yourself?

A. Yes, sir, I have.

Q. At that moment you thought a carbine would be responsible for the fire?

A. Yes.

Q. Is that what you told Mr. Jesse and Mr. Ramsey [the police officers]?

A. I said it sounded like a carbine, but may not have been one. I wasn't sure.

.    .    .    .

(App. 15–16)

Once the deputy found the carbine under the bus, he had no reason to search the strikers and their automobiles further. There was no probable cause to search for anything else. The subsequent search was simply a general exploratory search. This is the same kind of general exploratory search for weapons which led to the adoption of the Fourth Amendment. The British soldiers in Boston at least had a general warrant, or a "writ of assistance." According to the defendant, the deputy had nothing to justify the exploratory search except the company's money in his pocket.

Although I deplore the resort to violence in labor disputes, our history is replete with instances in which citizens engage in civil disobedience and resistance in labor disputes when they think that the authorities or the legal system has been bought off by their adversaries. Here all parties agree that the company was paying the deputy to furnish guard service and assist in breaking the strike. It may have led the strikers to believe that they could not depend on local law enforcement to protect them during the strike. It may have influenced them to resort to violence. Both sides were in the wrong. In such a situation, we should be careful to apply the law in a neutral and objective way. Since I can find no basis for a continuing search after the carbine was found, I would suppress the weapon in question.